IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Ronald R. Peterson, not individually but as Chapter 7 Trustee for the bankrupt estates of Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund Ltd., Colossus Capital Fund, L.P., and Colossus Capital Fund, Ltd.,

Plaintiff,

v.  No. 10 C 274

McGladrey and Pullen, LLC, et al.

Defendants.

MEMORANDUM OPINION AND ORDER

In this case, Ronald J. Peterson, in his capacity as the Chapter 7 Trustee for the bankrupt estates of several investment funds I collectively refer to as the "Lancelot Funds" or the "Funds"[1] has sued three related accounting firms (collectively, "McGladrey") and Simon Lesser, one of the firms' partners. The Trustee alleges that defendants' negligent and reckless audits in 2007 and, alternatively, in 2008, failed to detect that the

---

[1] These are the Lancelot Investors Fund, L.P., the Lancelot Investors Fund II, L.P., and the Lancelot Investors Fund Ltd. In the Third Amended Complaint, the Trustee states that he is no longer pursuing claims on behalf of Colossus Capital Fund, L.P., or Colossus Capital Fund, Ltd.

Funds had been duped into investing, from 2003 to 2007, in collateralized notes issued by an entity that turned out to be at the heart of a Ponzi scheme orchestrated by Thomas Petters. Before me is defendants' motion for summary judgment, which asserts two bases for judgment in their favor. Defendants first claim that the equitable affirmative defense of *in pari delicto* bars the Trustee from obtaining any recovery on his claims against them. Second, they argue that an exculpation clause in their contract with the Funds also bars the relief the Trustee seeks. As explained below, I agree that the undisputed facts establish the first of these affirmative defenses. Accordingly I need not reach the second.

I.

I previously dismissed an earlier iteration of the Trustee's complaint, concluding that allegations that the Funds' manager, Gregory Bell, discovered and began participating in Petters' scheme during the time period for which the Trustee sought to recover losses on behalf of the Funds, established that the Funds were, indeed, *in pari delicto* with (i.e., at least as culpable as) defendants for those losses. The Seventh Circuit agreed with my conclusion that Bell's knowledge was attributable to the Funds, and held that "if Bell was in on Petters's scam, then the Funds have no claim against McGladrey for failing to detect and warn the Funds about something that

Bell, and thus the Funds, already understood." *Peterson v. McGladrey & Pullen*, LLP, 676 F.3d 594 (7th Cir. 2012)("*McGladrey*"). But because the appellate court disagreed that the Trustee's pleadings alone established Bell's participation in the Ponzi scheme, it remanded the case for further proceedings.

Since then, the Trustee has twice amended his complaint. The substantive portion of the operative, Third Amended Complaint begins by describing how Bell came to be acquainted with Petters, then goes on to explain why Bell "trusted" Petters and why Bell agreed to set up new hedge funds—including the Lancelot Funds—to invest almost exclusively in an investment program that Petters explained as follows:

a) Lancelot I would loan money to Thousand Lakes [a Special Purpose Vehicle ("SPV"), owned and controlled by Petters Company, Inc. ("PCI")];

b) Thousand Lakes would issue SPV Notes to Lancelot I, which would allocate/assign some of the Notes (or interests in the Notes) to Lancelot II and/or Lancelot-Cayman;

c) Thousand Lakes was to use the loan proceeds to purchase consumer electronics from either of two vendors, Enchanted Family Buying Company or Nationwide Resources International, Inc., to fulfill pre-existing purchase orders from Costco's subsidiary;

d) PCI was to have pre-sold those electronics to Costco's subsidiary ("National Distributors"), and PCI was to then assign the purchase orders to Thousand Lakes; and

e) the SPV Notes were to be collateralized by Thousand Lakes' (1) inventory of electronics stored in warehouses, and (2)

3

accounts receivable from National Distributors, which were guaranteed by Costco for payment.

Third Amended Complaint, ¶ 15. The complaint goes on to explain that Petters cultivated Bell's continued confidence in the legitimacy of this investment program by documenting each loan the Funds made to Thousand Lakes with at least the following:

a) a National Distributors (Costco) purchase order to PCI, and a Thousand Lakes invoice to National Distributors--providing Bell with verification of the accounts receivable collateral;

b) a Thousand Lakes purchase order to Nationwide (or Enchanted), and a wire transfer confirmation from Thousand Lakes to Nationwide--providing Bell with verification of the inventory collateral; and

c) a Thousand Lakes SPV Note to Lancelot I (which could be assigned to Lancelot II and/or Lancelot-Cayman).

*Id.* at ¶ 17. Of course, we now know that these documents were fabricated, that there was no collateral supporting the SPV Notes, and no transactions between any Petters entity and any national distributor. But according to the Trustee, Bell "believed that Petters' investment program as described in ¶ 15 was lawful, that the documents described in ¶¶ 16 and 17 were genuine, and that the SPV Notes were collateralized." *Id.* at ¶ 18.

Indeed, the Third Amended Complaint paints a portrait of Bell as an unwitting pawn in Petters' fraud who made diligent—if ultimately futile—efforts to ensure that Petters' investment

program was sound. The Trustee explains, for example, that Bell hired "reputable professionals" to ensure the legitimacy of the investment program, and that none of them—two nationally recognized law firms, two audit firms (including defendants), and others—ever expressed any doubts that Petters' investment program, or the documents and collateral purporting to support it, were not bona fide.[2] The Trustee insists that Bell learned no sooner than the world did that Petters' investment program was smoke and mirrors down to its very core.

In his Third Amended Complaint, the Trustee seeks to hold defendants liable for failing to uncover Petters' fraud. Specifically, the Trustee claims that defendants failed: 1) to "verify the existence and valuation of the assets" that supposedly collateralized the notes the Funds issued; and 2) to ascertain (and inform the Funds' management) that the Funds' internal controls were insufficient to detect and prevent fraud.

In their motion, defendants insist that even if the Trustee could prove these allegations, Bell's own, undisputed misconduct

---

[2] The Trustee sued at least one of these law firms in a case that was likewise dismissed on the basis of *in pari delicto*. The Seventh Circuit affirmed the dismissal, though on different grounds, in *Peterson v. Winston and Strawn*, LLP, 729 F.3d 750 (7th Cir. 2013). The appellate court noted that the Trustee had instigated multiple suits against "solvent third parties," citing, in addition to this case, five bankruptcy avoidance actions. In a consolidated appeal, the Seventh Circuit upheld the bankruptcy court's grant of summary judgment against the Trustee. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013).

as the Funds' manager—including making false representations to potential investors about the "flow of money" among the entities involved in the investment program, and, later, engaging in a series of fraudulent banking transactions in an effort to conceal Thousand Lakes' delinquency on notes held by the Funds— contributed to the Funds' alleged losses. Accordingly, they argue, *in pari delicto* bars the Trustee's claim.

II.

As the Seventh Circuit previously held in this case, the principle animating the *in pari delicto* defense is that "when the plaintiff is as culpable as the defendant, if not more so, the law will let the losses rest where they fell." *McGladrey*, 676 F.3d at 596. The Trustee insists that the doctrine is inapplicable here because Bell's misconduct amounts, at best, to "a different fraud" from the one his complaint charges defendants with failing to detect. But the Trustee's restrictive construction of *in pari delicto* is not supported by the authority on which he relies.

The Trustee begins by quoting the Seventh Circuit's observation, in *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 574 (7th Cir. 2004), that the doctrine "is intended for situations in which the victim is a participant in the misconduct giving rise to his claim." But nothing in *Williams* precludes its application here. Indeed, the *Williams* court

cited confusing jury instructions and the "adverse interest" principle twice rejected in this case as the bases for declining to apply it in that case. *Id.* at 575. Nor do the Seventh Circuit's remarks, in this case, that "a participant in a fraud cannot claim to be a victim of its own fraud," and that the Trustee has no claim "if Bell was in on Petters' scam" 676 F.3d 596, imply that *in pari delicto* applies, as the Trustee contends, only if Bell "knew there was no collateral to support the SPV Notes and no underlying sales transactions." Pl.'s Opp. at 6. There is, indeed, a factual dispute over whether Bell knew these facts.[3] But defendants need not establish that Bell was as culpable as *Petters* to prevail on their *in pari delicto* defense; they need only show that Bell "bears equal fault for the alleged injury," as compared to the fault the Trustee attributes to defendants. *Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 233 (7th Cir. 2003).

As evidence of Bell's role in the Funds' collapse, defendants highlight Bell's misrepresentations about the "flow

---

[3] Defendants cite the testimony of Larry Reynolds, "a Petters co-conspirator who purported to be one of the vendors from whom Thousand Lakes was purchasing inventory." Reynolds testified that, in his view, Bell "came to believe, at some point, that there was no economic substance to the transactions he was doing with Petters," that Bell knew it was all a scam" by 2007, and that Petters told Reynolds Bell was a "partner of [theirs]" who "knew all about it." Def.'s L.R. 56.1 Stmt., Exh. 16, Deposition of Larry Reynolds, 65:8-66:1. Although the Trustee disputes that Bell was a "a participant in Petters' fraud," he raises no objection to this evidence.

7

of money" from the retailers that supposedly purchased inventory to Thousand Lakes, then from Thousand Lakes to the Funds. Defendants focus specifically on Bell's representations about the "lockbox" account—a Thousand Lakes bank account that was controlled by the Funds—that ensured that the money flowing through Thousand Lakes could not be diverted by Thousand Lakes (or anyone else) while en route from the retailers to the Funds. Indeed, it is beyond meaningful dispute that Bell materially misrepresented the flow of money by telling potential investors, systematically and throughout the life of the Funds, that retailers would deposit payments directly into the lockbox account when he knew from the beginning that there were no "direct" retailer payments, and that every payment into the lockbox came from PCI, another Petters entity.

The Trustee argues that because the lockbox was designed to eliminate the specific risk that money paid into the Thousand Lakes account could be siphoned off before reaching the Funds, and was not intended to protect against the distinct risk—which Bell claims neither he nor anyone he consulted perceived—that the money paid in had originated elsewhere than with the retailers, Bell's misrepresentations to investors are divorced from any losses the Funds suffered when Petters' scheme fell apart. Setting aside the lack of support in the case law for this kind of hair splitting, whatever the lockbox's intended

8

purpose, its design as Bell represented it would have ensured transparency with respect to the money's origins. More to the point, its failure to operate as designed had the effect of concealing those origins, allowing Petters' scheme to flourish undetected. Indeed, Bell admits that had the lockbox functioned as it he explained to investors, it would have allowed the Funds to see "over and over and over again that money was coming from" the retailer, and would have provided "persuasive evidence" that the retailer "was an actual party to the transaction" with Thousand Lakes. Def.'s L.R. 56.1 Stmt., Exh. 1, Deposition of Gregory Bell, 104:7-15. That Bell himself claims to have been satisfied with the evidence Petters fed him—copies of putative wire payments from the retailers to PCI, *see id.* at 82:23-83:1— does not make his misrepresentation to investors that money flowed directly from retailers to a Funds-controlled account any less culpable.

Moreover, in the same "Confidential Information Memoranda" to potential investors that contained misleading diagrams, flowcharts, and illustrations showing money flowing directly from retailers to the Thousand Lakes lockbox, Bell represented that the Funds would monitor Thousand Lakes "to confirm that [it] satisfies its obligations under the Purchase Order, including, without limitation, *the delivery of the Underlying Goods to the Retailer,* and the payment by the Retailer to

9

[Thousand Lakes] of the purchase price of the Underlying Goods." Def.'s L.R. 56.1 Stmt., Exh. 3 [DN 154-3 at 13] (emphasis added). This was also untrue, of course, since had the Funds ever sought to monitor "delivery of the Underlying Goods," they would have discovered that no such goods existed. In this way, too, Bell's misrepresentations allowed the scheme to continue unabated.

Finally, there is no dispute that as the Petters entities began to run out of new money, and Thousand Lakes became delinquent on some of the notes owned by the Funds, Bell affirmatively went "in" with Petters on a fraudulent, "second-tier Ponzi scheme," *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 744 (7th Cir. 2013), wiring money from the Funds to Thousand Lakes, which Thousand Lakes turned around and wired back to the Funds in putative satisfaction of the overdue notes. Bell engaged in scores of such "round-trip" transactions on the Funds' behalf from February of 2008 until Petters' scheme was exposed in September of 2008. Meanwhile, the Funds raised more than $200 million dollars from investors during this time, and also renewed a $50 million line of credit. In this way, too, Bell's intentional misconduct on behalf of the Funds increased the Funds' exposure to the losses that resulted when the Ponzi scheme ultimately fell apart.

Undisputed evidence of these aspects of Bell's involvement in the Petters scheme is the crux of defendants' *in pari delicto* motion, and it amply establishes that Bell's misconduct contributed to the Funds' losses at least as significantly as the negligence and recklessness with which the Trustee charges defendants. Accordingly, I conclude that the doctrine of *in pari delicto* bars the Trustee from recovering from defendants for the losses he asserts on the Funds' behalf.

III.

For the foregoing reasons, defendants' motion for summary judgment is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: April 8, 2014